**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 07 2012, 8:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**STEPHANIE E. SLUSS**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF M.B., J.B., & T.B., Minor Children, | ) ) ) ) | |
| Y.B., Mother, | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A02-1104-JT-397 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner, | ) ) | |
| And | ) ) | |
| CHILD ADVOCATES, INC., | ) ) | |
| Co-Appellee/Guardian ad Litem. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary K. Chavers, Judge Pro Tempore
The Honorable Larry E. Bradley, Magistrate
Cause Nos. 49D09-1008-JT-38127, 49D09-1008-JT-38128, 49D09-1008-JT-38129

**March 7, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**


Y.B. ("Mother") appeals the involuntary termination of her parental rights to her children, M.B., J.B., and T.B. (collectively, "the children"). Concluding clear and convincing evidence supports the judgment, we affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of M.B., who was born in September 1999; J.B., who was born in May 2001; and T.B., who was born in June 2002.[1] In April 2008, law enforcement personnel responded to a domestic disturbance call at the family home. Upon arrival, the police observed red marks on Mother's arm and shoulder. When questioned, two of the children reported witnessing "their dad hit their mom" on more than one occasion. (Ex. at 45.) One child further indicated Father "pushes" Mother and "punches her in the head a lot." (*Id.*) The children reported "missing a lot school even though they are not sick." (*Id.*) Mother admitted recent cocaine use, and the children reported Father used marijuana in the home. Law enforcement reported these facts to the Department of Child Services (DCS).

The next day, DCS filed a petition alleging M.B., J.B., and T.B. were children in need of services ("CHINS") because Mother had not provided "a safe and appropriate home environment free from domestic violence, substance abuse, and neglect." (*Id.*)

---

[1] The court involuntarily terminated the parental rights of the children's father, R.B. ("Father"), and we affirmed. *See In re M.B.*, 933 N.E.2d 588, No. 49A05-1002-JT-89 (Ind. Ct. App. 2010). Consequently, we address only Mother's rights.

The petition also indicated the family had a significant history of involvement with DCS; Mother had lost parental rights to six older children.

Following an evidentiary hearing on the CHINS petition in June 2008, the court adjudicated M.B., J.B., and T.B. as CHINS and removed the children from Mother's care. A Participation Decree directed Mother to participate in a variety of services designed to improve her parenting skills and facilitate reunification. Specifically, Mother was ordered to: (1) secure and maintain a legal source of income and suitable housing "safe for all residing within;" (2) participate in a parenting assessment and a drug and alcohol evaluation, and successfully complete any resulting recommendation for treatment; (3) submit to random drug screens; (4) successfully participate in a program addressing issues of domestic violence; (5) exercise regular visitation with the children as recommended by DCS; and (6) successfully complete home-based counseling and all recommendations of the home-based counselor. (*Id.* at 65.)

At the time of the dispositional hearing, Mother was incarcerated.[2] Sometime after her release, Mother began participating in court-ordered reunification services, but her participation was sporadic and ultimately unsuccessful. Throughout the CHINS case, Mother repeatedly tested positive for alcohol and illegal substances, and she arrived intoxicated for several visits with the children. Mother also continued to live with Father, despite their history of domestic violence.

In April 2009, Mother consented to the adoption of the children. The adoption was unsuccessful, however, and Mother's reunification services continued. In September

---

[2] The record does not indicate the charges against Mother or her release date.

2009, Mother gave birth to another child, V.B. The court adjudicated V.B. a CHINS in November 2009 and ordered reunification services similar to those ordered herein.

DCS petitioned for termination of Mother's parental rights to the children and V.B. in August 2010.[3] At the termination hearing, DCS presented evidence Mother had not completed a majority of the court's dispositional goals, including home-based counseling and domestic violence classes. Mother remained unemployed and she lived with Father, despite having recently obtained a protective order against him. Home-based therapist Nancy Dean Robbins indicated she was greatly concerned about Mother living with Father, because their relationship was not stable and she saw "red flags." (Tr. at 103.) When asked why she did not feel Mother could safely parent the children, Robbins stated the case had been open "a long time," and Mother still had not achieved "stability with housing and employment and financial stability." (*Id.* at 104.) Robbins explained Mother was "having a hard time taking care of herself," and so she "wonder[s] how [Mother] can take care of anyone else." (*Id.*)

Mother completed an Intensive Out-Patient ("IOP") drug treatment and aftercare program in November 2010, but she relapsed in December 2010. Caseworkers classified her prognosis for maintaining sobriety as "guarded" in light of this relapse, especially when coupled with Mother's admitted fourteen-year history of crack cocaine use. (*Id.* at 72.)

DCS presented evidence each of the children have special needs and have suffered significant emotional trauma while living with Mother. By the termination hearing, each

---

[3] The court continued V.B.'s proceedings when Father's counsel moved to withdraw at the hearing.

child was receiving the structure and discipline necessary to address behavioral issues. Guardian Ad Litem ("GAL") Mark Bass could not recommend the children be returned to Mother's care because Mother continued to abuse substances and because she was living with Father, with whom she had a history of domestic violence and whose parental rights had been terminated. Bass confirmed all three children were thriving in their current placements.

In March 2011, the court terminated Mother's parental rights to the children.

## DISCUSSION AND DECISION

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* When, as here, the juvenile court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. We determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a

5

constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities, *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008), and a juvenile court need not wait until a situation irreversibly harms a child before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before the State may terminate parental rights involuntarily, it is required to allege and prove the elements provided in Ind. Code § 31-35-2-4(b)(2) by "'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (*quoting* Ind. Code § 31-37-14-2 (2008)). If the court finds the allegations are true, "the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

1. Due Process

Mother contends the termination proceedings were "fundamentally unfair." (Appellant's Br. at 10.) She claims the juvenile court inappropriately terminated Father's parental rights prior to terminating Mother's parental rights, thereby eliminating a stable source of financial support for Mother and the children while at the same time basing its termination of Mother's parental rights, in part, on her financial instability.

We have cautioned juvenile courts to "be wary of voluntarily terminating parental rights of a non-custodial parent before adjudicating the parental rights of the custodial parent" because such a determination could "materially affect the rights of the child to receive support in the event the custodial parent's rights are not terminated." *In re J.T.*, 742 N.E.2d 509, 514 (Ind. Ct. App. 2001), *trans. denied*. Here, however, the termination of Father's parental rights occurred involuntarily, and we decline to hold that

involuntarily termination denied Mother a fair trial or constituted reversible error.

The record does not demonstrate Father's financial contributions were a stable source of income. Mother had an on-again-off-again relationship with Father and bounced between living with friends, relatives, and Father. Although Father apparently made financial contributions toward Mother's housing and utility bills from November 2010 through January 2011, he was laid-off from work in February 2011 and became unable to pay any of Mother's bills. Thus, at the time of the termination hearing, Father was not a source of financial support, regardless whether he had parental rights.

In addition, unlike in *J.T.*, the court did not permit Father to *voluntarily* relinquish his obligation to support the children. Rather, Father's parental rights to M.B., J.B., and T.B. were terminated *involuntarily* after a full and fair hearing during which DCS was required to prove, by clear and convincing evidence, the allegations in the involuntary termination petition. The dispositional order required Mother to secure and maintain a legal source of income and suitable housing "safe for all residing within." (Ex. at 65.) As Mother and Father had a history of domestic violence that had prompted Mother to obtain a restraining order against Father just a few months prior to the termination hearing, Mother could not have been surprised that she needed to find a way to support herself and her children without Father's assistance. Thus, we find no merit in Mother's assertion that she had no "notice of what was expected of her." (Appellant's Br. at 14) (emphasis removed).

Finally, as explained below, DCS presented sufficient evidence to support terminating Mother's rights. In light of the other grounds supporting termination --

7

including Mother's drug relapse and her continuation of a relationship with a man who abuses her -- we cannot say she was prejudiced by the earlier termination of Father's rights or by the expectation that she not rely on him for financial support. *See*, *e.g.*, *In re D.J.*, 755 N.E.2d 679, 684 (Ind. Ct. App. 2001) (concluding acceptance of non-custodial father's voluntary relinquishment of parental rights did not materially affect the child's rights nor deny mother a fair trial), *trans. denied.*

2.      Sufficiency of Evidence

Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to only one subsection of Ind. Code § 31-35-2-4, which defines the requirements for a termination petition.[4] The subsection at issue requires the State to prove

> that one (1) of the following is true:
> (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code § 31-35-2-4(b)(2)(B). Because we find it dispositive, we limit our review to the first element: whether there is a reasonable probability Mother will not remedy the problems that led to the children's removal.

---

[4] In her Summary of the Arguments, Mother asserts the juvenile court's findings fail to support its determination that termination of her rights is in the children's best interests. (*See* Appellant's Br. at 10.) However, Mother fails to support this assertion with cogent reasoning and citation to authority. *See* Ind. App. R. 46(A)(8). Therefore, the issue is waived. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (failure to present cogent argument or cite authority waives issue for appellate review), *trans. denied.*

When determining whether the State proved this factor, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d at 512. The court must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. A juvenile court may consider the services offered and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Finally, the State is not required to provide evidence ruling out all possibility of change; rather, it need establish only that there is a reasonable probability a parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In terminating Mother's parental rights to the children, the juvenile court made numerous detailed findings regarding the wealth of reunification services available to Mother for approximately three years, as well as Mother's failure to successfully complete and/or benefit from these services. Specifically, the court found:

6. Services were court ordered and referred to remedy conditions toward reunification. Services included home based services, domestic violence classes, substance abuse treatment and random urine screen.
7. [Mother] was unsuccessful in services to reunify with the three children, but continued services on an after born child for domestic violence, substance abuse and home based services.
8. Substance abuse treatment was to address [Mother]'s diagnosis of

9

Alcohol Dependence and Cocaine Dependence. She has a long history of at least fourteen years of crack cocaine use. During 2010, [Mother] admitted to a home based therapist that she "wanted to get clean but was unable", [sic] and the therapist's observations and concerns included [Mother]'s substance and alcohol abuse as being almost non-stop.

9. [Mother] completed an intensive outpatient substance abuse program and aftercare in November 2010. The prognosis for [Mother] to maintain sobriety was guarded, with her chances for recovery increasing the longer she follows a recovery plan and maintains sobriety.

10. [Mother] used after her completion of the substance abuse program. She participates with her addictions counselor two to three times a monthly and her prognosis is still guarded.

11. During the fall 2010, [Mother] moved into [Father's] house. Prior to that, she stayed in several places with friends, relatives, and [Father].

12. [Father] was paying the bills on the home in which [Mother] resides. [Mother] testified that [Father] lost his job in February and no longer pays her bills. At the time of trial, [Mother] owed two hundred fifty dollars for March rent.

13. [Mother] has not been successful in locating stable employment. She testified that she has "done hair" for several years, but home based case managers' reports indicate no employment.

14. [Mother] has a problem with following through in looking for employment or obtaining her G.E.D.

15. The current home based case manager is ready to close [Mother]'s services as the case has been open a long time with safety and stability still an issue. She felt [Mother] had a hard time taking care of herself and could not handle a child.

16. The current home based therapist saw significant progress but still has concerns with [Mother]'s anxiety, and her ability to provide safety and provide financial support for her child[ren].

17. At the time of trial, [Mother] had seven weeks of domestic violence classes prior to completion. With the help of an advocate, she obtained a protective order against [Father] in September 2010.

18. [Mother] claims she last saw [Father] in November 2010, which would be after the protective order. However, [Father] answered the home phone a couple of days prior to trial when the current home based case manager called, and [Mother]'s relatives inform [DCS] that [Father] is at the home.

\* \* \* \* \*

22. [Mother]'s history with [DCS] includes having six children previously adopted out and an open CHINS case on a child born in September 2009, which child she visits but is not close to having trial in-home placement visits.

23.     There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their mother. The children have been removed for almost three years. [Mother] is still in domestic violence classes and there are indications that she maintains contact with [Father] who pays, or until the last month, paid her bills. Her housing and employment situation remains unstable. There also exists a major concern of [Mother] relapsing after her substance abuse program, especially in light of her long history of crack cocaine use and her substance abuse diagnosis. After three years, [Mother] is not in a position where her service providers, the Guardian ad Litem[,] or [DCS] can recommend home placement as being safe for the children and where their needs would be met.

(App. at 28-30.) On appeal, Mother argues findings seven, thirteen[5] and sixteen "are not supported by, or are contradicted by the evidence."[6] (Appellant's Br. at 18.)

With regard to finding seven, Mother asserts she was not "unsuccessful in services to reunify with the three children," and had in fact "completed *most* of the services." (*Id.* at 19) (emphasis added). She asserts "the fact that her progress in some of the services came after the CHINS was filed on V.B. do [sic] not matter." (*Id.*) "[T]he time for parents to rehabilitate themselves is during the CHINS process, prior to the filing of the termination petition." *Prince v. Dep't of Child Serv.*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007). At the time of the termination hearing, most DCS caseworkers and home-based counselors agreed Mother had not completed most of the court-ordered services.

---

[5] In her Appellant's Brief, Mother alleges she is challenging finding "12." (Appellant's Br. at 19.) However, she quotes language from finding thirteen, and her arguments relate to the facts in finding thirteen. Therefore, we address the validity of finding thirteen, not finding twelve.

[6] Mother also claims finding eight, which discusses Mother's history of drug abuse and her inability to get clean in 2010, demonstrates the "court failed to consider the circumstances at the time of the termination trial." (Appellant's Br. at 20.) As a trial court must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child," *In re J.T.*, 742 N.E.2d at 512, and as findings nine and ten discuss Mother's drug use in the months immediately prior to the termination hearing, we find no error in the finding regarding Mother's history of drug abuse.

During the termination hearing, current DCS case manager John Buckingham confirmed multiple reunification services, including parenting and substance abuse assessments, substance abuse treatment programs, random drug screens, home-based counseling, domestic violence education programs, and supervised visits with the children, were available to Mother during the underlying CHINS and termination cases. The only services Mother completed by the time of the termination hearing were the parenting assessment, IOP, and substance abuse aftercare program.

Moreover, whether Mother's successfully completed drug treatment remained in question, as Mother admitted she "smoked up with her sister," (Tr. at 18), and therefore produced a "dirty screen" for "crack cocaine" in December 2010 despite her completion of IOP one month earlier. (*Id*. at 200.) Addictions therapist Julie Lisek testified Mother had experienced a "rough patch" in March or April 2010 during IOP, (*id*. at 65); Mother continued to struggle with sobriety in June 2010 because of her "displaced" anger and "impulsive[ness]," (*id.* at 67); and her assessment of Mother's future ability to stay sober remained "guarded." (*Id.* at 72.)

Home-based therapist Carolyn Doss began working with Mother in January 2010, but closed the case in July 2010 due to Mother's "excessive lying to and about [Doss] and the absence of any trust between Mother and Doss." (Ex. at 124.) Her report also indicates Doss had ongoing "concerns" because Mother repeatedly blamed "other people" for her own actions, claiming "'other' people put alcohol in her drinks; . . . put cocaine in her food; and . . . lie about her." (*Id.* at 126.) Doss testified domestic violence remained a concern due to Mother's ongoing relationship with Father. Based on the

foregoing, we conclude the evidence supports finding seven.

As for finding thirteen, Mother argues the court incorrectly determined she had not been successful in locating stable employment because "[n]o one contradicted [Mother's] claims that she has 'done hair' for several years and that she had some other sources of income, including baking and working at church functions." (Appellant's Br. at 19.)

Case manager Buckingham acknowledged Mother's report she braided hair and performed various other jobs during church functions to earn money, but Mother never provided DCS with *proof* of a "legal source of income" sufficient to establish she could "meet the basic needs of the children." (Tr. at 23-24.) When asked whether he had "ever seen documentation, to date, of a legal and stable source of income from [Mother]," Guardian ad Litem ("GAL") Mark Bass answered, "I have not." (*Id.* at 172.) This evidence supports finding thirteen.

Finally, Mother asserts finding sixteen is "contradicted by the evidence" because the current home-based counselor Parker testified "she did *not* have concerns about the safety and appropriateness of Mother's home for the children." (Appellant's Br. at 20.) Although Parker testified she still "had some concerns about [Mother's] level [of] anxiety," (Tr. at 184), Mother is correct that Parker testified she did *not* have concerns about the safety and appropriateness of Mother's home for the children. (*Id.* at 186.) Thus, that part of finding sixteen misrepresents Parker's testimony.[7]

A court on review must determine whether the specific findings are adequate to

---

[7] We note Parker never had contact with the children, did not have access to information regarding Mother's domestic violence counseling, did not work with Mother on parenting skills, and did not know a GAL had been assigned to the children in this case.

support the juvenile court's decision, *In re B.J.*, 879 N.E.2d 7, 19 (Ind. Ct. App. 2008), *trans. denied*, and we are obliged to disregard any special finding that is not proper or competent. *Id.* Nevertheless, we may reverse a juvenile court's judgment only if its findings amount to prejudicial error. We cannot reverse because of an erroneous finding unless that finding was the "'sole support for any conclusion of law necessary to sustain the judgment of the court.'" *Id.* (quoting *Riehle v. Moore*, 601 N.E.2d 365, 369 (Ind. Ct. App. 1992), *trans. denied*). Finding sixteen is not the sole support for any conclusion of law necessary to sustain the judgment. Disregarding finding sixteen as erroneous, multiple findings support the juvenile court's conclusion there is a reasonable probability the conditions resulting in M.B., J.B., and T.B.'s removal and continued placement outside of Mother's care will not be remedied. Mother's arguments to the contrary are to an invitation to reweigh the evidence, which we may not do. *See D.D.*, 804 N.E.2d at 265.

We reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford County Dep't of Public Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here and, accordingly, affirm.

Affirmed.

NAJAM, J., and RILEY, J., concur.